# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

ASA DAWSON, et al.,

    Plaintiffs,

v.

ALLSTATE VEHICLE AND
PROPERTY INSURANCE
COMPANY,

    Defendant.

Case No. 1:22-cv-776

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

On September 20, 2022, Asa and Kaitlyn Dawsons' home caught fire. (Compl., Doc. 1, #3). The home, and everything in it, was destroyed. (*Id.*). Soon after, the Dawsons notified Allstate, their home and property insurer. (*Id.* at #4). Allstate demanded several documents to investigate the claim, most of which the Dawsons eventually provided. (*Id.*). But when Allstate requested that the Dawsons submit to an examination under oath (EUO), they refused. They instead sued Allstate for failing to cover the loss of their home and possessions. (*Id.* at #4–5). Allstate has since moved for judgment on the pleadings (Doc. 17) under Federal Rule of Civil Procedure 12(c). Allstate argues that its duty to cover the Dawsons' loss under the insurance policy was discharged by the Dawsons' refusal to submit to an EUO. For the reasons below, the Court **GRANTS** Allstate's motion and **DISMISSES** the Dawsons' claims **WITHOUT PREJUDICE**.

## BACKGROUND

The Dawsons purchased a "House & Home" insurance policy on August 2, 2022, covering their home in Batavia, Ohio. (Doc. 1, #2). Tragically, less than two months later, on September 20, 2022, that home caught fire. (*Id.* at #3). The Dawsons lost their home and all their possessions. (*Id.*). Shortly thereafter, the Dawsons provided notice to Allstate, their insurer, of the loss. (*Id.* at #4). They also provided a sworn statement in proof of loss,[1] estimating a loss potentially reaching $1.2 million. (*Id.*).

Immediately after the fire, Allstate covered the Dawsons' temporary housing expenses, as contemplated by their policy, but allegedly refused to provide funds for clothing and food. (*Id.* at #5). Allstate also began investigating the claim in October 2022. In connection with that, it requested various documents from the Dawsons, including "federal and state income tax returns, bank statements, phone records, lenders for mortgage records, remodeling documents, and communications with their insurance agent." (*Id.* at #4). Allstate further requested that the Dawsons provide access to Asa Dawson's personal Facebook account, provide their cell phones for forensic examination, and submit to an EUO. (*Id.* at #4, 9).

The Dawsons did not respond to repeated entreaties for over two months. (*See* Am. Answer, Doc. 16, #243–52, 255–56 (Allstate's legal correspondence, dated from October 4, 2022, to December 28, 2022, requesting documents to assist with its

---

[1] Allstate denies the Dawsons submitted a sworn statement in proof of loss. (Doc. 16, #236). But for the purposes of Allstate's motion, the Court must take all well-pleaded facts in the Complaint as true. *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).

investigation of the Dawsons' claim)).² During this time, Allstate discontinued coverage of the Dawsons' housing expenses. (Doc. 1, #5).

The Dawsons eventually provided the first set of documents by compiling the tax returns, bank statements, and other records from third party sources and providing them to Allstate for review. (*Id.* at #4). But the Dawsons refused to provide their cellphones for forensic analysis or submit to an EUO. (*See* Doc. 1, #9–10; Doc. 16, #255–57 (correspondence relating to Allstate's request for EUO and Plaintiffs' counsel's notifying Allstate of this lawsuit)).³

Instead, they sued Allstate for its "material breach of the policy" and "refus[al] to compensate the Dawsons … for their loss." (Doc. 1, #5). They assert two claims— breach of contract and bad-faith. For relief, they seek a declaratory judgment, along with money damages and attorneys' fees. (*Id.* at #11). To date, Allstate has not formally denied coverage of the claim, but it also has not covered the loss of the Dawsons' home. (*Id.* at #5; Doc. 16, #237).

---

² The Dawsons' complaint repeatedly references Allstate's demands for documents and other information. (*See* Doc. 1, #4, 9). Allstate has attached, as exhibits to its answer, the legal correspondence between itself and the Dawsons in which those requests were made. (Doc. 16, #242–61). The Court may properly consider this correspondence because the letters were referenced in the Complaint, attached to Allstate's pleading, and provide information integral to the claims at issue. *Gascho v. Glob. Fitness Holdings, LLC*, 918 F. Supp. 2d 708, 719 (S.D. Ohio 2013).

³ The Dawsons' Complaint does not explicitly state that they failed to submit to an EUO, but it suggests as much. (*See* Doc. 1, #5). And the legal correspondence provided by Allstate reflects the same. (*See* Doc. 16, #255–56). So the Court relies on that reading of the Complaint in resolving the present motion. It is unclear from the pleadings whether the Dawsons provided access to Asa Dawson's Facebook account. So the Court does not credit or rely on such an inference in its analysis.

Allstate filed its answer on March 9, 2023, and amended its answer on May 15, 2023. (Docs. 7, 16). Although its amended answer referenced a counterclaim in the heading, the pleading does not actually contain a counterclaim—only affirmative defenses. (*See* Doc. 16). Allstate then moved for judgment on the pleadings. (Doc. 17). The motion has been fully briefed and is ripe for review.

## LEGAL STANDARD

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389 (6th Cir. 2007). Under that standard, the Court accepts the well-pleaded factual allegations in the Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But that does not mean the Court must take everything plaintiffs allege at face value, no matter how unsupported. The Court may disregard "naked assertions" of fact or "formulaic recitation[s] of the elements of a cause of action." *Id.* (cleaned up). Once the Complaint is boiled down to its well-pleaded facts, the Court may allow a claim to go forward only if the plaintiff alleges "sufficient factual matter … to state a claim to relief that is plausible on its face." *Id.* (cleaned up).

## JURISDICTION AND CHOICE OF LAW

The Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are completely diverse (the Dawsons are both citizens of Ohio, while

4

Allstate is a citizen of Illinois[4]) and the amount in controversy exceeds $75,000. (*See* Doc. 1, #4 (estimating the potential loss as extending up to $1.2 million)).

Federal courts sitting in diversity apply the choice-of-law principles of the forum state—in this case, Ohio. *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). So to determine which law to apply to the Dawsons' two claims, breach of contract and bad faith, the Court employs Ohio choice-of-law rules.

Start with breach of contract. Under Ohio law, a contract's choice-of-law provision governs unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Schulke Radio Prods., Ltd., v. Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983) (citing Restatement (Second) of the Conflict of Laws § 187 (Am. L. Inst. 1971)).[5] The insurance policy here contains a choice-of-law provision, which specifies that the law of the state in which the covered premises (the Dawson's home) is located will govern any claims or disputes related to the policy. (Doc. 1-4, #32). As the Dawsons' home (before its unfortunate demise) was in Ohio, that means Ohio law

---

[4] The original complaint provided insufficient detail about the parties' citizenship, so the Court ordered the Dawsons to file a notice detailing the citizenship of all parties. (11/21/23 Not. Order). They have done so, which filing confirms that the parties are completely diverse. (Doc. 27).

[5] *Schulke* listed another exception to the enforceability of the parties' choice-of-law provision, which applies when "[the] application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." 453 N.E.2d at 686 (citation omitted). But the parties did not discuss the proper choice of law in their briefing and did not flag for the Court any other state that might have an interest in their transaction, so the Court deems this second exception inapplicable on the given record.

5

governs any claims related to the policy unless that state bears no "substantial relationship to the parties or the transaction." *Schulke Radio*, 453 N.E.2d at 686. The Court finds that the state where the insured property is located clearly bears a substantial relationship to the transaction underlying the insurance policy. So Ohio law will govern the breach-of-contract claim.

Although the analysis is a bit different for the Dawsons' bad-faith claim, Ohio law still governs. "The initial step in any choice of law analysis involves the characterization of the subject matter of or the issues in the case (e.g., tort or contract) and of the nature of each issue and whether it raises a problem of procedural or substantive law." *In re Bankers Trust Co.*, 752 F.2d 874, 881 (3d Cir. 1984) (citing E. Scoles & P. Hay, *Conflict of Laws* 50–51 (1984)). Because the Court applies Ohio choice-of-law rules, the Court also applies Ohio law at this "initial step" of determining the nature of the claim. Under Ohio law, a bad-faith claim in the insurance context is not rooted in the parties' contractual commitments, but in tort. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1320 (Ohio 1983). For tort actions, Ohio choice of law follows the Restatement of the Law of Conflicts, which turns on which state possesses the "most significant relationship" to the tort suit. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984). Factors relevant to the significant-relationship test include the place of injury, the residence of the parties, and the place where the relationship of the parties is centered. *Id.*

Ohio has the most significant relationship to the Dawsons' tort claim. Ohio is the place where the relationship of the parties—a relationship based on insuring a

6

residential premises—is centered. The Dawsons reside in Ohio. The injury, in a sense, occurred in Ohio because Allstate allegedly engaged in bad faith in connection with adjusting a loss that occurred in Ohio. The Court finds that Ohio bears the most significant relationship to the Dawsons' tort claim and will accordingly apply Ohio law.

## LAW AND ANALYSIS

With the choice-of-law questions out of the way, the Court turns to the question whether the Dawsons have plausibly alleged either a breach-of-contract or a bad-faith claim under Ohio law. The Court concludes they have not.

**A.    Breach-of-Contract Claim**

"The elements of a breach of contract claim are the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Becker v. Direct Energy, LP*, 112 N.E.3d 978, 988 (Ohio Ct. App. 2018) (cleaned up). To allege a "plausible claim for relief," the Dawsons must allege facts sufficient to provide a plausible basis for concluding that each element has been met. *Iqbal*, 556 U.S. at 679; *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) ("At this stage, we consider whether the complaint states a claim for relief that is plausible, when measured against the elements of [the] … claim."). Here, there is no question regarding the first element—the Dawsons had entered a contract with Allstate, and it is attached to their Complaint. (Doc. 1-4). The same cannot be said, however, as to the second or third element. And the Dawsons' failure to plausibly

7

allege that those elements have been met means that their claim, as currently pleaded, fails as a matter of law.

To see why, consider some fundamentals of contract law. Apart from anticipatory breach (which the Court discusses below), a party breaches a contract only when they fail to perform a duty that is due under the contract. Restatement (Second) of Contracts § 235 (Am. L. Inst. 1981). But not all duties are due at the same time. While some duties may require a party to perform the moment a contract is inked, other duties may be due later or may be subject to conditions. Some conditions are linked to events purely extrinsic to the parties and the contract (such as an act of God). Others are linked to one party's duties under the contract such that the contract effectively sequences the required performance (i.e., "if you do x, I will then do y"). When a party's duty is subject to a condition, that party's duty to perform is not due until the condition occurs. *Little v. Real Living HER*, 2014-Ohio-5664, ¶ 12 (10th Dist.). Putting those pieces together, if Party A's duty to do x is conditioned on Party B's performance of y, then x is not due—and therefore Party A cannot be said to have "breached" its duty to do x—until Party B performs y.

How does that map onto the insurance policy here? The policy provides that Allstate will cover "sudden and accidental direct physical loss to [the Dawsons'] property" if not specifically excluded. (Doc. 1-4, #33). The contract does not exclude accidental loss due to fire from the definition of "sudden and accidental direct physical loss," (*id.* at #33–35), and Allstate does not dispute that that type of event is generally

8

covered under the policy. But the policy at issue also contains a section entitled "Conditions," that states, as relevant here:

> In the event of a loss to any property that may be covered by this policy, [the Dawsons] must a) immediately give [Allstate] … notice … d) give [Allstate] all accounting records, bills, invoices and other vouchers … [and,] f) as often as [Allstate] reasonably require[s,] … submit to examinations under oath … .

(*Id.* at #41). The policy then states that "[Allstate has] no duty to provide coverage under this section if [the Dawsons] … fail to comply with items a) through g) above, and this failure to comply is prejudicial to [Allstate]." (*Id.*).

That policy provision includes conditions layered on conditions. So let's examine them one by one. First, Allstate's duty to provide coverage for the Dawsons' lost home is explicitly conditioned on the Dawsons' submitting to an EUO. Second, the Dawsons' duty to sit for an EUO is implicitly conditioned on whether Allstate's request for one was reasonable. (*Id.* ("as often as [Allstate] *reasonably require*[*s*]") (emphasis added)). Third, whether Allstate's duty to cover the loss to the Dawsons' home is suspended (because of the Dawsons' refusal to sit for an EUO) is itself conditioned on whether the Dawsons' refusal was prejudicial to Allstate.

So what routes along this decision tree lead to a conclusion that Allstate breached a duty that it presently owes the Dawsons? The simplest path (which, regrettably, the Dawsons have not chosen) is for the Dawsons to sit for an EUO. Then, assuming no other provision or exclusion kicks in, Allstate's duty to cover would presumably be due. Alternatively, the Dawsons could say that Allstate's request for an EUO was unreasonable (meaning the Dawsons' duty to sit for one did not arise

9

and consequently Allstate's duty to cover is due). Or, lastly, the Dawsons could argue that Allstate was not prejudiced by their refusal (meaning that regardless whether its request for an EUO was reasonable, Allstate's duty to cover is not suspended and is now due).

But the Dawsons' allegations fail to render any of these possible routes plausible. The Dawsons' factual allegations do not give rise to a reasonable inference that Allstate's request for an EUO was unreasonable. True, they allege that "Allstate's demand for an EUO was not based on any good faith investigation into the Dawsons' claim" and that it was "intended to intimidate the Dawsons and [to] delay the ultimate resolution of the claim." (Doc. 1, #4). But that is nothing more than a "naked assertion" of fact about Allstate's intent. *Iqbal*, 556 U.S. at 678 (cleaned up). As the Sixth Circuit has observed, when "[p]laintiffs present nothing more than unadorned allegations concerning Defendants' intent and motivation[,] … [t]hese vague and conclusory allegations of nefarious intent … are not well-pleaded." *Ctr for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 377–78 (6th Cir. 2011). The Dawsons do not allege any concrete, non-conclusory facts from which the Court can reasonably infer that Allstate's motive for seeking an EUO was nefarious or that its request was unreasonable. They simply assert that it was so. That is not enough to clear the plausibility hurdle. Indeed, on the allegations here, the Court concludes that it is highly likely that Allstate's request was *reasonable*. After all, the Dawsons had purchased insurance only two months prior to submitting a claim for over $1 million in allegedly covered losses resulting from a fire. Common sense, *see Iqbal*, 556 U.S.

10

at 679, suggests that Allstate may have some questions about that fire and the Dawsons' losses.

The Dawsons also do not plausibly allege that their refusal to sit for an EUO was not prejudicial to Allstate. Their Complaint says nothing on the matter. Rather, the Dawsons argue in their briefing that *Allstate* bears the burden of showing prejudice. (Opp'n, Doc. 18, #283–84). But recall the pleading standard and basics of contract law recited above. The Dawsons must plausibly allege that *each* element of their claim has been met—including that the defendant (Allstate) breached the contract. *Iqbal*, 556 U.S. at 679; *Darby*, 964 F.3d at 444. And to show a breach, a plaintiff must not only show the defendant had a duty under the contract, but also that the defendant failed to perform that duty *after it became due*. Restatement (Second) of Contracts § 235 (Am. L. Inst. 1981). So it is the *Dawsons* who must create a reasonable inference that Allstate was not prejudiced because—given the Dawsons' refusal to sit for an EUO and the way the policy conditions interrelate—alleging a lack of prejudice is a prerequisite to finding that Allstate's duty to cover was due and that its failure to perform that duty means it is therefore in breach. And again, not only do the Dawsons offer no facts supporting that inference but, on the facts alleged, the inference actually runs the other way. After all, the Dawsons are presumably the best source of information regarding when and how the fire started, the nature of the personal property in the house, and related matters. It is quite reasonable to believe that failing to sit for an EUO in such circumstances would interfere with (i.e., prejudice) Allstate's efforts to investigate the claim.

11

Rather than making the showings needed to plead a viable breach-of-contract claim, the Dawsons offer a variety of proposed workarounds. None of them are convincing. First, they claim that Allstate materially breached the contract (thereby excusing the Dawsons of any obligation to submit to an EUO) when it ceased covering the additional living expenses. (Doc. 18, #278–79). This is wrong under the policy language. The policy requires Allstate to "pay the reasonable increase in living expenses" *only* if "a direct physical loss [Allstate] cover[s]" occurs. (Doc. 1-4, #39). So, unless and until there is a determination of coverage, Allstate has no duty under this provision. Further confirming that Allstate did not breach a present obligation to continue making payments, the policy includes a provision entitled "Our Settlement Of Loss," that provides that Allstate will settle a covered loss "within 60 days after the amount of loss is finally determined." (*Id.* at #43). So the earliest that Allstate could have a duty to pay under the policy would be 60 days after the loss occurred, which for the additional living expenses claim would presumably be, at the earliest, 60 days after those costs were incurred. But Allstate requested, and the Dawsons declined to sit for, an EUO before that time, which means that the Allstate's duty to cover the loss (and, conterminously, pay for additional living expenses) has not yet arisen. Therefore, Allstate did not breach that provision, let alone materially breach it.[6]

---

[6] True, it appears that Allstate had undertaken some initial payments of those types of costs to the Dawsons. (*See* Doc. 1, #5). But voluntarily beginning performance before it is due typically does not give rise to an obligation to continue that performance.

They next argue that Allstate's refusal to pay living expenses was an anticipatory breach, which then excused the Dawsons' lack of performance. (Doc. 18, #280–81). This argument has more promise but is ultimately unavailing. Under an anticipatory breach theory, a party can be liable for giving notice that it will breach a duty not yet due. *See JDS So Cal, Ltd. v. Ohio Dep't of Nat. Res.*, 110 N.E.3d 657, 671 (Ohio Ct. App. 2018). So theoretically, even if Allstate's duty to cover additional living expenses or the loss of the home had not arisen, it could still be liable under the insurance policy. But to have anticipatorily breached a contract, the defendant must repudiate the contract by "overt communication" or by "an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Id.* (citation omitted). The Dawsons do not allege that Allstate overtly communicated anything in connection with its refusal to pay for the Dawsons' living expenses. And it is not plausible that Allstate's discontinuing the Dawsons' housing stipend constituted a "clear determination" not to perform entirely. Rather, the most plausible explanation is that Allstate was suspending payments on account of the Dawsons' failure to sit for an EUO. But that means that Allstate was abiding by the sequencing of performances the contract adopts, rather than repudiating its duties as a whole.

In sum, based on the pleadings to date, the Dawsons have not plausibly alleged that Allstate has failed to perform a duty that it currently owes the Dawsons, and thus have not pleaded a viable breach-of-contract claim. But, because it is possible

13

that the Dawsons may be able to address the shortcomings the Court identified, the Court **DISMISSES** the claim **WITHOUT PREJUDICE**.

**B.     Bad-Faith Claim**

That leaves the bad-faith claim. "[A]n insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *Hoskins*, 452 N.E.2d at 1319 (Ohio 1983). When an insurer acts in bad faith in relation to an insurance claim, its liability is not necessarily coterminous with the contract. *Id.* at 1320. Rather, its liability lies in tort. *Id.* An insurer is liable in tort for bad faith whenever "its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994) (citation omitted).

The Dawsons' bad-faith argument centers on Allstate's request for various documents and its request to conduct a forensic examination of the Dawsons' phones. (Doc. 18, #287–89). They contend that Allstate is not contractually entitled to most of the documents requested (which included "federal and state income tax returns, bank statements, phone records, lenders for mortgage records, remodeling documents, and communications with their insurance agent" (Doc. 1, #4)), because the contract requires the Dawsons to produce only "accounting records, bills, invoices, and other vouchers." (Doc. 1-4, #41). On this count they are correct. Allstate's initial request for documents appears to have exceeded what it was contractually entitled to receive under the policy. And while Allstate told the Dawsons that the policy required them to cooperate with its investigation, (Doc. 16, #251), the policy in fact contains no

14

clause expressly imposing a generalized duty to cooperate. So, the Dawsons argue, the *real* reason that Allstate sought the documents (or phones) in question was to delay the investigation and processing of the claim. (Doc. 18, #289).

But on the record before the Court, that is not a plausible explanation for Allstate's request. Allstate first requested the documents on October 4, 2022, only 14 days after the fire. (Doc. 16, #243). Allstate's promptness in requesting information belies the notion that it was simply seeking documents to create delay. And as to what was requested, while Allstate did ask for several items to which it was not entitled, it *also* asked for a crucial source of information—an EUO—to which it appears Allstate *was* entitled under the policy. And the Dawsons, as stated previously, refused to sit for that examination. The Court finds that a "reasonable justification" for not immediately covering the claim. *Zoppo*, 644 N.E.2d at 400.

Without a plausible showing of some intent to delay, the only alternative basis for the bad-faith claim would be an argument that an insurer's seeking documents to which it is not entitled constitutes per se bad faith. But the Dawsons cite no authority for that proposition, and the Court could locate none. Most of the investigation-related bad-faith cases stem from a *lack of effort* to investigate, not an overzealous investigation. *See McNair v. State Farm Fire & Cas. Co.*, No. L-13-1163, 2013 WL 6795616, at *5–*6 (Ohio Ct. App. Dec. 3, 2013) (collecting cases).

Because the Dawsons have not pleaded a viable bad-faith claim, Allstate is entitled to judgment as a matter of law on this claim. The Court accordingly **DISMISSES** this claim **WITHOUT PREJUDICE** as well.

## CONCLUSION

For the reasons stated, the Court **GRANTS** Allstate's Motion for Judgment on the Pleadings (Doc. 17) and **DISMISSES** both of the Dawsons' claims. Because Allstate has not formally denied coverage of the Dawsons' claim and because future factual developments (like the Dawsons' submitting to an EUO) could lead to a viable breach-of-contract or bad-faith claim under this insurance policy, the Court dismisses the action[7] **WITHOUT PREJUDICE**.[8] The Clerk is directed to **ENTER JUDGMENT** and to **TERMINATE** this matter on the Court's docket.

SO ORDERED.

January 2, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[7] The Court makes clear, pursuant to *Boxill v. O'Grady*, 935 F.3d 510, 516–17 (6th Cir. 2019), that it is dismissing the entire action, rather than merely the Complaint.

[8] In saying this, the Court takes no position on whether the Dawsons' sitting for an EUO at this point in time would "cure" the Dawsons' failure to satisfy the corresponding condition precedent.